IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DAVID FITZJOHN,

            Plaintiff,

    v.

COMMISSIONER OF SOCIAL SECURITY,

            Defendant.

No. CV 07-1911-MO

OPINION AND ORDER

**MOSMAN, J.,**

Plaintiff David Fitzjohn seeks judicial review of the final decision of the Commissioner of the Social Security Administration finding him not disabled and denying his application for Disability Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Following thorough and careful review of the record, the court AFFIRMS the final decision of the Commissioner.

## BACKGROUND

### I.    <u>Administrative History</u>

Mr. Fitzjohn previously filed an application for social security benefits in the 1980s. (A.R. 81.)[1] His application was denied initially on March 7, 1986. (A.R. 81.) The record does

---

[1] Citations "A.R." refer to indicated pages in the official transcript of the administrative record filed on June 3, 2008 (#13).

PAGE 1 - OPINION AND ORDER

not indicate whether the decision was appealed.  Mr. Fitzjohn applied for DIB and SSI again on

January 28, 2004.  (A.R. 34, 66, 378.)  His application was denied initially on March 11, 2004.

(A.R. 53-58.)

Instead of appealing the denial of benefits, Mr. Fitzjohn protectively filed his current

application for DIB and SSI on June 14, 2004.  (A.R. 32, 398.)  He alleges disability starting

March 15, 2002, due to orthopedic injuries including shoulder pain and knee pain related to a

varus[2] deformity of the knee and a varus malunion of the tibia, hepatitis C, and psychological

problems.  (A.R. 66, 159, 163, 321, 399.)  Mr. Fitzjohn's last insured date for DIB is December

31, 2007.  (A.R. 59.)  The application was denied initially and on reconsideration.  (A.R. 48-52,

43-45.)  An Administrative Law Judge ("ALJ") held a hearing on March 6, 2007.  (A.R. 422.)  At

the hearing, Mr. Fitzjohn was represented by an attorney.  (A.R. 424.)  Mr. Fitzjohn and

vocational expert ("VE") Patricia Ayerza testified at the hearing.  (A.R. 423.)

The ALJ issued a decision on April 27, 2007, in which she found that Mr. Fitzjohn was

not entitled to receive benefits.  (A.R. 22.)  That decision became the final decision of the

Commissioner on October 26, 2007, when the Appeals Council denied Mr. Fitzjohn's request for

review.  (A.R. 5-7.)  This appeal followed.

## II.    **Mr. Fitzjohn's History**

At the time of the hearing, Mr. Fitzjohn was a forty-seven-year-old man.  (A.R. 425.)  He

did not complete high school but obtained his GED while he was in the Army.  (A.R. 426.)  Mr.

Fitzjohn has worked as a laborer at an aluminum plant, as a handyman, as a laborer at temporary

---

[2] Varus: "a deformity in which an anatomical part is turned inward toward the midline of
the body to an abnormal degree."  Merriam-Webster's Collegiate Dictionary 1384 (11th ed.
2003).

labor placement services, in construction, as an apartment manager/handyman with his wife, and has done some maintenance work as part of compensated work therapy with the Veterans Administration ("VA").  (A.R. 426-36.)

Mr. Fitzjohn's right leg was badly broken in a motor vehicle versus pedestrian accident in 1986.  (A.R. 163, 198.)  Apparently the leg healed improperly causing a varus deformity of the knee and a varus malunion of the tibia, which have resulted in one leg being approximately three centimeters longer than the other.  (A.R. 163, 263, 280.)  This deformity causes right ankle, knee, and hip pain and results in Mr. Fitzjohn walking on the side of his right foot.  (A.R. 263.)  Surgery is not considered optimal to correct these problems because of the difficulty of the procedure and the difficulty of healing post-surgery.  (A.R. 284.)  Doctors have prescribed a shoe lift, which Mr. Fitzjohn could not use because it caused him to walk out of his shoe.  (A.R. 284, 441.)  Mr. Fitzjohn has also been prescribed orthotic shoes, but he does not want to wear the same shoes every day so he apparently has not worn them much.  (A.R. 263.)  He also has a knee brace that he indicates helps with his knee pain, which he wears when his "knee is being particularly tricky" or if he will have to stand and walk more than usual.  (A.R. 446.)

Mr. Fitzjohn also suffers from degenerative disc and joint disease.  A cervical spine x-ray shows degenerative changes to Mr. Fitzjohn's spine, particularly at C3-4.  (A.R. 354.)  An MRI indicated that there is moderate degenerative joint disease in his knees and that he has suffered severe cartilage loss in part of his right knee.  (A.R. 353.)  He also has reported pain in his shoulder radiating down to his hand causing numbness and tingling, particularly when doing repetitive motions like using a computer mouse.  (A.R. 166, 269.)  However, the right ulnar motor study was normal.  (A.R. 261-62.)

PAGE 3 - OPINION AND ORDER

In March 2004, Mr. Fitzjohn was diagnosed with hepatitis C.  (A.R. 199-200.)  He has been advised to avoid the use of alcohol or acetaminophen (Tylenol).  (A.R. 200.)  His only symptoms appear to be mild pain or sensation in his liver.  (A.R. 444.)

More recently, Mr. Fitzjohn has complained of psychological problems.  In August 2005, when he was at the VA due to right ear pain, Mr. Fitzjohn requested a visit with a mental health provider.  (A.R. 276.)  He reported to psychiatric mental health nurse practitioner ("PMHNP") Juliane McKim a history of anxiety, paranoia, and his concern regarding seeing images in his peripheral vision when no one is there.  (A.R. 272-73.)  He also indicated that he had left home precipitously in July and had spent two weeks living on Mt. Hood.  (A.R. 272.)  Nurse McKim diagnosed Mr. Fitzjohn with anxiety disorder not otherwise specified ("NOS") and rule-out psychotic disorder NOS and rated his Global Assessment of Functioning ("GAF") at fifty.[3]  (A.R. 274.)  In October 2005, Mr. Fitzjohn saw Carol Utterberg PMHNP and reported similar symptoms related to anxiety and paranoia.  (A.R. 321.)  Nurse Utterberg's initial diagnosis was psychosis NOS and rule-out anxiety disorder versus depression with anxiety versus depression with psychotic features.  (A.R. 324.)  She rated his initial GAF at 50.  (A.R. 324.)  By September 2006, Nurse Utterberg had adjusted her diagnosis to include post-traumatic stress disorder ("PTSD") related to childhood abuse, anxiety disorder NOS, depression NOS, and rule-out psychotic disorder.  (A.R. 234.)

---

[3] A GAF score reports the clinician's judgment of an individual's overall level of psychological, social, and occupational functioning.  Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. text revision 2000) [hereinafter DSM-IV-TR].  The clinician must consider an individual's functioning on a hypothetical continuum of mental health-illness, and place the individual on a 100 point scale.  *Id.* at 34.  A GAF score from forty-one to fifty indicates that an individual has "[s]erious symptoms . . . [or a] serious impairment in social, occupational, or school functioning."  *Id.*

## DISCUSSION

I.    **Standards**

The initial burden of proof rests on a claimant to establish disability.[4] *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995).  The claimant must demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The Commissioner must conduct a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520.  Each step is potentially dispositive.  At step one, the claimant is not disabled if the Commissioner finds he is engaged in substantial gainful activity.  *Yuckert*, 482 U.S. at 140; 20 C.F.R. § 404.1520(a)(4)(i).  At step two, the claimant is not disabled if he has no "medically severe impairment or combination of impairments."  *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. § 404.1520(a)(4)(ii).  At step three, the claimant is disabled if his impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."  *Yuckert*, 482 U.S. at 141; 20 C.F.R. § 404.1520(a)(4)(iii).

---

[4] Plaintiff suggests that he and the Commissioner share the burden at steps one through four.  (Pl.'s Br. (#22) 12.)  This is an inaccurate statement of the law.  A claimant has the burden of proof at steps one through four; the burden shifts to the Commissioner only at step five.  *See Tackett v. Apfel*, 180 F.3d 1094, 1098, 1098 n.3 (9th Cir. 1999) (stating that although the ALJ shares the burden to develop the record, the burden of proof remains on the claimant as to steps one through four).

If the inquiry proceeds to step four, the Commissioner must assess the claimant's residual functional capacity ("RFC"), which is an assessment of the sustained, work-related activities the claimant can do on a regular and continuing basis.  20 C.F.R. § 404.1545(a); *see also* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184.  At step four, the claimant is not disabled if the Commissioner finds he retains the RFC to perform his past work.  *Yuckert*, 482 U.S. at 142; 20 C.F.R. § 404.1520(a)(4)(iv).  At step five, the Commissioner must determine whether the claimant is able to do any other work that exists in the national economy.  *Yuckert*, 482 U.S. at 142; 20 C.F.R. § 404.1520(a)(4)(v).  Here the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do.  *See Yuckert*, 482 U.S. at 141-42; *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  If the Commissioner meets this burden, the claimant is not disabled.  *Tackett*, 180 F.3d at 1098-99.

A district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Batson v. Comm'r*, 359 F.3d 1190, 1193 (9th Cir. 2004); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  If the "evidence is susceptible to more than one rational interpretation," one of which supports the Commissioner's final decision, the district court must uphold the Commissioner's decision. *Andrews*, 53 F.3d at 1039-40; *Batson*, 359 F.3d at 1193; *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

//

PAGE 6 - OPINION AND ORDER

## II.    **The ALJ's Decision**

The ALJ found that Mr. Fitzjohn has not engaged in substantial gainful activity at any time relevant to this decision.  (A.R. 15.)  She found that Mr. Fitzjohn has the following severe impairments: degenerative joint disease in both knees, cervical degenerative disc disease, residual symptoms of a leg length discrepancy, hepatitis C, and a history of drug and alcohol abuse.  (A.R. 16.)  The ALJ found that these impairments did not meet or medically equal a disorder listed in the Commissioner's regulations, and assessed Mr. Fitzjohn's RFC:

> [T]he claimant has the residual functional capacity to lift and carry ten pounds occasionally and less than ten pounds frequently.  During an eight-hour day he can sit for up to six hours and stand or walk for at least two hours.  Furthermore, he should not use ladders, ropes or scaffolds, and is limited to only occasional overhead reaching, climbing, balancing, stooping, kneeling, crouching, and crawling.  The claimant has no other functional or environmental limitations.

(A.R. 18.)  The ALJ applied these findings to her analysis.

The ALJ found that Mr. Fitzjohn could no longer perform his past relevant work at step four.  (A.R. 21.)  At step five, the ALJ found that Mr. Fitzjohn could perform jobs that exist in significant numbers in the national economy.  (A.R. 21-22.)  Therefore, the ALJ found Mr. Fitzjohn "not disabled" and ineligible for DIB and SSI benefits through the date of her decision.  (A.R. 22.)

Mr. Fitzjohn disputes the ALJ's findings at steps two, three, and five.  (Pl.'s Br. (#22) 12.)  First, he contends that the record is incomplete and that the case should be remanded under sentence six of 42 U.S.C. § 405(g) to complete the record.  (*Id.* at 13.)  Second, he argues that the ALJ erroneously failed to include his shoulder problems, cervical spine degenerative disc disease, and mental impairments as severe impairments at step two.  (*Id.* at 14-15.)  In a related

argument, Mr. Fitzjohn states that the ALJ improperly rejected the opinions of PMHNP McKim and Utterberg.  (*Id.* at 17-19.)  Third, Mr. Fitzjohn contends that he meets or equals Listing 1.02 at step three.  (*Id.* at 15-17.)  Finally, he argues that the ALJ failed to comply with SSR 82-59 when she raised the issue of Mr. Fitzjohn's non-compliance with prescribed treatment.  (*Id.* at 19-20.)

### III.    The Record is Complete

Mr. Fitzjohn first contends that the record is incomplete, requiring remand under sentence six of 42 U.S.C. § 405(g) to complete the record.  (Pl.'s Br. (#22) 13.)  Specifically, Mr. Fitzjohn indicates that twenty-three pages of medical records are missing from the VA file, pages 87 to 110 of the ALJ's Exhibit 5F.  (*Id.*)  He argues that the ALJ referred to one of these missing pages, which was not made available to Mr. Fitzjohn in the preparation of his appeal and that the mental health chart note at page 270 of our record is a continuation of a longer record, the beginning of which is missing.  (*Id.*)

Upon careful examination of the record, I find that it is complete and that Mr. Fitzjohn and this court have obtained all of the pages available to the ALJ.  The List of Exhibits indicates that the ALJ's Exhibit 5F originally contained 148 pages, specifically pages 70 to 217.  (A.R. 3.)  There are still 148 pages in this exhibit, found between pages 230 and 377 of the current record.  (A.R. 3.)  This is confirmed by the fact that the page numbers for Exhibit 5F were handwritten in the lower right hand corner of the pages, page 217 became page 230 and page 70 became page 377, and all of the intervening pages are intact.  (*See* A.R. 230-377.)  Mr. Fitzjohn's confusion regarding the pages, particularly his inability to find the beginning of the chart note continued on page 270, is a result of the rather confusing organization of those pages.  The chart note at record

PAGE 8 - OPINION AND ORDER

page 270 is a continuation of the note at page 332 and the chart note beginning on page 269 is continued at page 309.[5]  Because the record is complete, although poorly organized, remand is not necessary under sentence six of § 405(g).

**IV.    Severe Impairments at Step Two**

At step two in the sequential proceedings, the ALJ determines if the claimant has a medically determinable physical or mental impairment that is "severe."  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is "severe" if it "significantly limits your ability to do basic work activities."  20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521.  Such an impairment must last, or be expected to last, twelve months.  20 C.F.R. § 404.1509.

Mr. Fitzjohn argues that the ALJ's step two findings erroneously mischaracterized his problems with his right leg and omitted the following severe impairments: shoulder problems, cervical spine degenerative disc disease, and mental impairments including psychosis, anxiety, PTSD, and depression.  (Pl.'s Br. (#22) 14).

**A.    *Failure to Include Shoulder Pain and Cervical Spine Degenerative Disease and Mischaracterization of Right Leg Injury***

Mr. Fitzjohn fails to indicate how the failure to include his shoulder problems or his cervical spine degenerative disease affected the ALJ's decision.  After indicating that these impairments were left off the list of severe impairments, he does not mention them again.  (*See id.*)  Mr. Fitzjohn does not even indicate what evidence in the record supports the contention that his shoulder problems significantly limit his ability to do basic work activities.  (*See id.*)  The

---

[5] The page numbers typed in the lower right hand corner of record pages 230 to 377 indicate the correct order of these pages and confirm that the particular notes indicated by Mr. Fitzjohn are not missing, but merely improperly ordered.  (*See* A.R. 230-377.)

burden is on the claimant at step two to demonstrate disability and Mr. Fitzjohn has failed to meet this burden as to his shoulder problems. *See Roberts*, 66 F.3d at 182 (citation omitted) (stating that "[t]he claimant has the burden of establishing a prima facie case of disability"). Mr. Fitzjohn similarly failed to indicate how the ALJ mischaracterized his right leg problems at step two.

Furthermore, the ALJ did not actually omit shoulder pain, cervical spine degenerative disease, or Mr. Fitzjohn's leg problems. The ALJ included cervical degenerative disc disease as a severe impairment. (A.R. 16.) Cervical degenerative disc disease refers to degenerative disc disease of the cervical spine (the neck). *See* Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties §§ 16.3, 16.10 (Sam W. Wiesel ed., 3d ed. 1993). A common symptom of cervical degenerative disc disease is pain between the shoulder blades and radiating down the arm. *Id.* § 16.10. Thus, the ALJ included both Mr. Fitzjohn's shoulder pain and his cervical spine degenerative disc disease as severe impairments at step two. The ALJ also included degenerative joint disease in Mr. Fitzjohn's knees and residual symptoms of his leg length discrepancy as severe impairments. (A.R. 16.) Thus, none of these issues were actually omitted.

Finally, I hold that any possible omission or mischaracterization was harmless. The ALJ's analysis at steps four and five must consider all of a claimant's impairments, both severe and non-severe. 20 C.F.R. § 404.1545(a)(2). Because the ALJ proceeded beyond step two in the sequential analysis, the court will consider the effect of the ALJ's alleged error in reviewing the ALJ's subsequent findings. *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (holding an ALJ's step two omission harmless when the ALJ proceeded beyond step two in the sequential analysis).

PAGE 10 - OPINION AND ORDER

Mr. Fitzjohn does not indicate how the omissions or potential mischaracterization of his leg problems affected the ALJ's analysis at later stages. He does not challenge the ALJ's RFC or the VE's testimony at step five applying the RFC to the national labor market. Indeed, the RFC limits the weight Mr. Fitzjohn can lift and carry to ten pounds, indicates that he can walk only two hours in an eight hour day, and limits his overhead reaching, addressing concerns related to Mr. Fitzjohn's leg, neck, and shoulder. (A.R. 18.) Without direction regarding how the RFC might be improper considering the ALJ's alleged errors, I decline to speculate regarding such matters. Thus, any error here was harmless.

## B.    *Failure to Include Mental Impairments*

Mr. Fitzjohn contends that the ALJ erroneously failed to include his mental impairments as severe at step two. (Pl.'s Br. (#22) 14-15.) First, he states that the ALJ failed to give clear and convincing reasons for rejecting the opinions of PMHNPs McKim and Utterberg. (*Id.* at 17-19.) Second, Mr. Fitzjohn argues that the ALJ failed to apply the "special technique" used to evaluate the severity of mental impairments at each level in the administrative review process, required under 20 C.F.R. § 404.1520a. (Pl.'s Reply (#24) 8-9.)

### 1.    **Psychiatric Mental Health Nurse Practitioners' Opinions**

Step two findings rely upon medical evidence only. 20 C.F.R. § 404.1520(a)(4)(ii). Nurse practitioners are not acceptable medical sources under the regulations. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a). They are considered "other sources" or "other medical sources." SSR 06-03p, 2006 WL 2329939. The regulations require "evidence from 'acceptable medical sources' to establish the existence of a medically determinable impairment." *Id.* at *2 (citing 20 C.F.R. §§ 404.1513(a), 416.913(a)). Evidence from "other sources" may be used to show the severity of an

impairment and how it affects the claimant's ability to work.  20 C.F.R. §§ 404.1513(d),

416.913(d).  However, "[i]nformation from these 'other sources' cannot establish the existence of

a medically determinable impairment . . . there must be evidence from an 'acceptable medical

source' for this purpose."  SSR 06-03p, 2006 WL 2329939, at *2.

Mr. Fitzjohn did not provide any evidence from an acceptable medical source to establish

the existence of a medically determinable mental impairment, as required by the regulations.  20

C.F.R. §§ 404.1513(a), 416.913(a).  Thus, the ALJ was not required to consider his allegations of

mental impairment at any step and failing to include such impairments as severe at step two was

not error.  However, because the ALJ discussed Mr. Fitzjohn's claims of mental impairment and

the opinions of the nurse practitioners, I will examine whether the ALJ properly considered those

opinions in determining the severity of Mr. Fitzjohn's mental impairments.

"Opinions from [other] medical sources . . . are important and should be evaluated on key

issues such as impairment severity and functional effects, along with the other relevant evidence

in the file."  SSR 06-03p, 2006 WL 2329939, at *3.  The ALJ should consider the following in

evaluating opinion evidence from "other medical sources":

> (1) How long the source has known and how frequently the source has seen the
> individual; (2) how consistent the opinion is with other evidence; (3) the degree to
> which the source presents relevant evidence to support an opinion; (4) how well the
> source explains the opinion; (5) whether the source has a specialty or area of
> expertise related to the individual's impairment(s); and (6) any other factors that tend
> to support or refute the opinion.

*Id.* at *4-5.  An ALJ may reject the testimony of an "other source" by providing reasons germane

to that witness.  *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

PAGE 12 - OPINION AND ORDER

As discussed above, both Nurse McKim and Nurse Utterberg diagnosed Mr. Fitzjohn with a range of mental impairments including some combination of anxiety disorder NOS, PTSD, depression NOS, and rule-out psychotic disorder. (A.R. 234, 274.) They also rated Mr. Fitzjohn's GAF at fifty, which denotes "[s]erious symptoms . . . [or a] serious impairment in social, occupational, or school functioning." DSM-IV-TR, *supra* note 3, at 34. The ALJ considered these opinions but did not give them great weight, finding that Mr. Fitzjohn's mental impairments created only mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace. (A.R. 17.)

To support the limited weight given to the opinions, the ALJ stated that Mr. Fitzjohn's activities of daily living and occasional work did not support a GAF of fifty. (A.R. 16.) An opinion's inconsistency with other evidence in the record is a proper basis on which to reject that opinion. SSR 06-03p, 2006 WL 2329939, at *4. In this case, the ALJ noted that Mr. Fitzjohn can use public transit, perform personal care without assistance, and cook simple microwave meals, he keeps his room clean, does laundry once a week, shops for his own groceries with food stamps, reads the comics and sports page every day, walks in a nearby park almost every day, and uses a computer at the library once a week to check his email. (A.R. 19-20.) He also does odd jobs and yard work for his aunt, volunteers once a month for three or four hours feeding people at Loaves and Fishes, and participated in a compensated work therapy program at the VA from August 15 through October 9, 2006. (A.R. 15.) The ALJ found that together, "[t]hese activities suggest that the claimant is capable of performing the basic demands of competitive,

remunerative, unskilled work on a sustained basis," which is inconsistent with a GAF of fifty. (A.R. 20.)

The ALJ also noted that both nurses "apparently relied quite heavily on the claimant's subjective reports of symptoms and limitations and seemed to uncritically accept as true most, if not all, of what the claimant reported." (A.R. 16.) Because the ALJ found that there were valid reasons to question Mr. Fitzjohn's subjective complaints, she did not give the nurses' reports great weight. (A.R. 16-17.)

An ALJ may reject medical opinions based in large part on a "claimant's self-reports that have been properly discounted as incredible." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing *Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999)). "Credibility determinations are the province of the ALJ." *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989). In deciding whether to accept a claimant's subjective symptom testimony, "an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms." *Smolen v. Chater,* 80 F.3d 1273, 1281 (9th Cir. 1996) (footnote omitted).

> Under the *Cotton* test, a claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged . . . .'" *Bunnell v. Sullivan,* 947 F.2d [341,] 344 [(9th Cir. 1991) (en banc)] (quoting 42 U.S.C. § 423(d)(5)(A) (1988)); *Cotton* [*v. Bowen*,] 799 F.2d [1403,] 1407-08 [(9th Cir. 1986)]). The *Cotton* test imposes only two requirements on the claimant: (l) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom.

*Smolen*, 80 F.3d at 1281-82.

The ALJ must provide clear and convincing reasons for discrediting a claimant's testimony regarding the severity of his symptoms. *Dodrill*, 12 F.3d at 918; *see also Smolen*, 80 F.3d at 1283. The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995). But, if an ALJ notes at least "arguably germane reasons for dismissing" testimony, "even if he did not clearly link his determination to those reasons" the ALJ's decision is supported by substantial evidence. *Lewis*, 236 F.3d at 512.

The ALJ may consider objective medical evidence and the claimant's treatment history as well as the claimant's unexplained failure to seek treatment or to follow a prescribed course of treatment. *Smolen*, 80 F.3d at 1284. The ALJ may also consider the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge about the claimant's functional limitations. *Id*. In addition, the ALJ may employ ordinary techniques of credibility evaluation such as prior inconsistent statements concerning symptoms and statements by the claimant that appear to be less than candid. *Id*.; *see also* SSR 96-7p, 1996 WL 374186, at *4-5. When the ALJ rejects claimant's subjective statements, he must provide "specific, convincing reasons." *Id.*

I hold that the ALJ properly discounted Mr. Fitzjohn's credibility regarding the severity of his symptoms. As discussed above, the ALJ found that Mr. Fitzjohn's activities of daily living and recent work activity indicated that he is capable of performing competitive work on a sustained basis. The ALJ also noted that Mr. Fitzjohn has "often failed to comply with the medical regimen prescribed by his treating doctors." (A.R. 19.) For example, Mr. Fitzjohn has not consistently worn his orthotic shoes, delayed starting to use Prozac when it was prescribed,

and continued drinking after being diagnosed with hepatitis C.  (A.R. 263, 274, 451.)  Finally, the

ALJ noted that Mr. Fitzjohn did not allege any mental health impairments when he first applied

for disability benefits and first requested to see a mental health provider in August 2005, eight

months after his reconsideration date and five months after requesting a hearing before the ALJ.

(A.R. 17.)  Even when he asked to see a mental health provider, Mr. Fitzjohn minimized his

symptoms, describing his anxiety as neither urgent nor long term.  (A.R. 17, 275.)  These are

specific, clear, and convincing reasons to discredit Mr. Fitzjohn's credibility as to the severity of

him symptoms.  Thus, the ALJ provided appropriate and sufficient reasons to reject Nurse

McKim and Nurse Utterberg's opinions.

### 2.    Application of the Special Technique

Mr. Fitzjohn also contends that the ALJ failed to apply the "special technique" at step two

to determine whether his mental impairments were severe.  (Pl.'s Br. (#22) 14-15; Pl.'s Reply

(#24) 8-10.)

The regulations require that when there is evidence of a mental impairment, the "special

technique" for evaluating such impairments be employed at every step of the administrative

review process.  20 C.F.R. § 404.1520a.  Under the special technique, the ALJ must first

determine whether the claimant has a medically determinable impairment, specify the symptoms,

signs, and laboratory findings that substantiate the presence of the impairment(s), and document

his or her findings.  *Id.* § 404.1520a(b)(1).  Next, the ALJ must rate the degree of functional

limitation resulting from the impairment(s).  *Id.* § 404.1520a(b)(2).  Rating the degree of

functional limitation requires looking at the "four broad functional areas in which [the

Commissioner] will rate the degree of [the claimant's] functional limitation: Activities of daily

living; social functioning; concentration, persistence, or pace; and episodes of decompensation."

*Id.* § 404.1520a(c)(3).

First, as discussed above, there is no evidence from an "acceptable medical source" supporting a finding that Mr. Fitzjohn is suffering from a medically determinable mental impairment.  Thus, the ALJ did not need to continue beyond the first step of the "special technique."  Because the ALJ did continue in her analysis, I will examine whether the "special technique" was applied appropriately.

The ALJ does not cite the "special technique" but does indicate on the record that Mr. Fitzjohn has only mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace, and has suffered no episodes of decompensation.  (A.R. 17.)  Generally, federal courts may draw inferences from an ALJ's opinion, even when something is not specifically written down.  *See Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).  Thus, I am entitled to infer from the use of the four broad functional areas describe by 20 C.F.R. § 404.1520a(c)(3) that the ALJ applied the "special technique."  Her determination that Mr. Fitzjohn has only mild restrictions is supported by substantial evidence, as discussed above.  Thus, the ALJ did not commit error at step two.

## V.    Mr. Fitzjohn Does Not Meet or Equal Listing 1.02

Mr. Fitzjohn contends that he meets Listing 1.02 and the ALJ should have found him disabled at step three.  (Pl.'s Br. (#22) 15-17.)  I find that the ALJ properly considered Mr. Fitzjohn's impairments and did not commit error at step three.

//

PAGE 17 - OPINION AND ORDER

Listing 1.02 *Major Dysfunction of a Joint(s)* is defined as:

Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.02.  An

[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities . . . To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* at 1.00B2b.  The ALJ found that Mr. Fitzjohn "failed to show that his impairment results in either the inability to ambulate effectively on a sustained basis or to perform fine and gross movements effectively on a sustained basis." (A.R. 17.)  The Commissioner concedes that Mr. Fitzjohn has a gross anatomical deformity in his right leg, but contends that Mr. Fitzjohn has not

PAGE 18 - OPINION AND ORDER

presented evidence that he suffers from chronic pain and stiffness or has limited or abnormal

motion.  (Def.'s Br. (#23) 15.)  However, the ALJ rested her decision solely on lack of evidence

supporting the (A) or (B) subparts to Listing 1.02.  (A.R. 17.)  Mr. Fitzjohn's briefing focuses on

Listing 1.02A and does not argue that he meets or equals Listing 1.02B.  (Pl.'s Reply (#24) 2, 4-

8.)  Therefore, I will assume that Mr. Fitzjohn meets all the requirements of the introductory

paragraph and focus on subpart (A).

To support his argument that his right leg injury is of listing level severity, Mr. Fitzjohn

points to medical and lay evidence in the record indicating that he has difficulty walking more

than four blocks (A.R. 305), his pain is more severe when he is climbing or descending stairs

(A.R. 263), he was issued a cane (A.R. 278, 343-44), his right leg is unstable (A.R. 198), and he

cannot walk on uneven surfaces (A.R. 458).  This evidence is insufficient to prove that Mr.

Fitzjohn meets Listing 1.02.  First, although Mr. Fitzjohn testified that he cannot walk on uneven

surfaces, the ALJ found that his testimony regarding the severity of his symptoms was not

entirely credible.  Second, Mr. Fitzjohn has been provided a cane by the VA, but he does not use

a walker or two crutches, which would limit the function of both his upper extremities as

required by 1.00B2b.  Finally, the ALJ found that Mr. Fitzjohn regularly uses public

transportation, walks in the park almost every day, and shops for his own groceries.  (A.R. 19.)

She also noted that Mr. Fitzjohn testified that he could stand for one hour at a time and walk for

twenty minutes at a time, for a maximum of one hour per day.  (A.R. 19.)  This is substantial

evidence supporting her finding that Mr. Fitzjohn can ambulate effectively and does not meet

Listing 1.02A.

PAGE 19 - OPINION AND ORDER

In the alternative, Mr. Fitzjohn argues that he medically equals Listing 1.02 and requests that this court remand this case to take testimony of a medical expert as to equivalency. (Pl.'s Reply (#24) 7-8.) The ALJ must "take into account the combined effect of a claimant's physical and mental impairments in determining whether his condition equals a listing." *Lester v. Chater*, 81 F.3d 821, 828 (9th Cir. 1995). Mr. Fitzjohn argues that the ALJ did not take his cervical degenerative disc disease or mental impairments into account in deciding that he did not meet or equal Listing 1.02. There was no need to consider Mr. Fitzjohn's mental impairments because no evidence from an "acceptable medical source" was provided to demonstrate that they are medically determinable impairments and the ALJ properly found that they were mild and did not affect his ability to sustain employment. Mr. Fitzjohn points to no evidence in the record that supports the conclusion that his cervical degenerative disc disease is sufficiently severe to equal Listing 1.02 in combination with his right leg injury. In fact, as discussed above, the evidence shows that Mr. Fitzjohn can ambulate effectively. Thus, the ALJ correctly found that Mr. Fitzjohn does not medically equal Listing 1.02.

## VI.    <u>Non-Compliance with Prescribed Treatment</u>

Mr. Fitzjohn argues that benefits must be paid pending further development of Mr. Fitzjohn's non-compliance with treatment under SSR 82-59 because the ALJ brought up the issue of non-compliance at the hearing. (Pl.'s Br. (#22) 19-20; Pl.'s Reply (#24) 10-11.)

Mr. Fitzjohn misapprehends the problem SSR 82-59 addresses. "An individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which . . . can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability."

SSR 82-59, 1982 WL 31384, at *1.  When the Commissioner "believes that treatment might restore an individual's ability to engage in [substantial gainful activity], but no treating source has prescribed such treatment, a determination of allowance will be made, and the [Commissioner] will refer the individual to [vocational rehabilitation]."  *Id.* at *2.

First, Mr. Fitzjohn misunderstands when payment is made pending referral for vocational rehabilitation.  The ALJ did not indicate that non-prescribed treatments might restore Mr. Fitzjohn's ability to work.  Therefore, benefits need not be paid pending further development of Mr. Fitzjohn's ability to work with some additional form of treatment.  *Id.*

Second, the ALJ in this case did not find that Mr. Fitzjohn was disabled, but non-compliant.  She continued on to step five and found that Mr. Fitzjohn was not disabled because there were jobs in the national economy that he can perform.  (A.R. 21-22.)  Mr. Fitzjohn suggests that the true basis for the decision was non-compliance, as was the case in *Ibarra v. Comm'r of Soc. Sec. Admin.*, 92 F. Supp. 2d 1084 (D. Or. 2000).  In that case, this court found that the ALJ

> did not expressly purport to deny claimant benefits on the ground that she failed to follow prescribed treatment, but his comments . . . and his ultimate finding that claimant is not disabled rest, in significant part, on his expressed perception that her failure to follow a prescribed treatment caused her condition to be worse than it might otherwise be.

*Id.* at 1087 (internal citations omitted).  That is not the case here.  The ALJ discussed Mr. Fitzjohn's non-compliance with medical advice solely in the context of Mr. Fitzjohn's credibility.  Non-compliance is relevant to credibility determinations.  *Smolen*, 80 F.3d at 1284.  At no time did the ALJ indicate that Mr. Fitzjohn's severe impairments would be significantly alleviated by

PAGE 21 - OPINION AND ORDER

better compliance with treatment recommendations.  Therefore, the ALJ did comply with SSR 82-59.

## CONCLUSION

The Commissioner's decision that Mr. Fitzjohn does not suffer from disability and is not entitled to benefits under Title II or XVI of the Social Security Act is based upon correct legal standards and supported by substantial evidence.  The Commissioner's decision is AFFIRMED and the case is dismissed.

IT IS SO ORDERED.

Dated this  13th  day of June, 2009.


/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge